# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT

**In Case No. 2023-0205, <u>State of New Hampshire v. Cody M. Frye</u>, the court on September 26, 2023, issued the following order:**

The court has reviewed the written arguments and the record submitted on appeal, has considered the oral arguments of the parties, and has determined to resolve the case by way of this order.  <u>See</u> <u>Sup. Ct. R.</u> 20(2).  The defendant, Cody M. Frye, appeals a decision from the Superior Court (<u>Attorri</u>, J.) ordering him preventively detained without bail pursuant to RSA 597:1-c (Supp. 2022) or, in the alternative, RSA 597:2, III(a) (Supp. 2022).  The defendant argues that the court erred in finding that the State proved, by clear and convincing evidence, that: (1) pursuant to RSA 597:1-c, the "proof is evident" or the "presumption great" that the defendant violated RSA 318-B:26, IX (Supp. 2022); and (2) pursuant to RSA 597:2, III(a), the defendant's release would endanger the safety of the public.  Based upon the record before us, we conclude that the State failed to meet its burden of proof required by RSA 597:1-c and accordingly reverse the trial court's ruling on that issue.  Because we cannot determine the extent to which the trial court's RSA 597:1-c determination factored into its RSA 597:2, III(a) dangerousness ruling, we vacate and remand.

The following facts are agreed upon by the parties or are otherwise supported by the record.  On July 31, 2022, the body of the decedent, Joshua Smith, was discovered.  It was later determined that the decedent died from fentanyl toxicity.  Police found the decedent's body surrounded by drug paraphernalia, including two baggies, one filled with a white powdery substance and the other filled with a tan powdery substance.  Officers also found the decedent's cell phone in a bathroom.  Testing at the state laboratory determined that the white substance was cocaine and the tan substance was fentanyl.

After reviewing the decedent's text messaging history, Detective Gaudreau learned that, within days of his passing, the decedent had been communicating with a man named Walter Peek-Antolin.  Gaudreau testified that he believed that the defendant ordered "four different types of drugs" from Peek-Antolin: "pretty," which is cocaine, two grams of "dirty," which is fentanyl, a "zip," which is a baggie of marijuana, and marijuana edibles.

Text messages between the defendant and Peek-Antolin and between Peek-Antolin and the decedent, as well as other evidence, established that on July 29, the defendant delivered drugs to the decedent's residence.  Although

the decedent ordered four different drugs from Peek-Antolin, Gaudreau believed that the defendant only delivered fentanyl, cocaine, and possibly the edibles. Gaudreau testified regarding a text message conversation between Peek-Antolin and the decedent in which Peek-Antolin "says that basically he forgot the zip and he would deliver it himself the following day." The evening of July 29, following the delivery, the decedent suffered a non-fatal overdose. When the decedent's mother found her son overdosing that night, she destroyed some of his drug paraphernalia and drugs, which Gaudreau believed to be most likely the cocaine.

The following day, on July 30, another text message conversation and phone calls between the decedent and Peek-Antolin took place. The decedent told Peek-Antolin that he had "leaned on" what he had and needed more of the "pretty," leading Gaudreau to believe that the decedent was "asking for more of the cocaine." Although these text messages demonstrate that Peek-Antolin and the decedent discussed another drug delivery, Gaudreau testified that he "cannot confirm that th[e] transaction did actually happen" and the investigation uncovered no evidence that the defendant was involved in any sort of delivery on July 30. That same day, from approximately 1 p.m. until 9:30 or 10 p.m., the decedent covered a shift at the restaurant where he worked. After work, the decedent met up with his co-worker and a friend outside of the restaurant. The decedent's friend was a former drug user who had previously acquired drugs from the decedent to give to other people. The decedent, who according to his friend had been struggling with an opiate addiction for years, left the restaurant in the early morning hours of July 31. That morning, the decedent's body was found in his residence.

The defendant was charged with sale of a controlled drug resulting in death in violation of RSA 318-B:26, IX. In March 2023, the defendant had a bail hearing in superior court. At the close of the hearing, the court found that the State met its burden of proof and ordered the defendant detained without bail pursuant to RSA 597:1-c, or, in the alternative, that the defendant's release would pose a danger to the community. See RSA 597:2, III(a). The court noted, however, that it would continue to consider the issue. The defendant filed a subsequent motion for clarification as to whether the order made from the bench was final.

The court subsequently issued a written order affirming the decision delivered from the bench. The court found that the State clearly and convincingly proved that the defendant delivered drugs, including fentanyl and cocaine, to the decedent on the evening of July 29. The court further found that, although the State "may not have proven . . . to a mathematical certainty" that the drugs the defendant delivered to the decedent on July 29 were the same drugs that caused the decedent's death on July 31, "the presumption is great." The court reasoned that the "temporal proximity of the delivery, coupled with the fact that drugs of the same kind were found near the

decedent's body, raises a strong presumption." The court also found that "[t]he defense's speculation notwithstanding, there is no evidence that the decedent received fentanyl from any other source in the interval between his receipt from the defendant and his death."

In the alternative, the court found that the defendant's release would endanger the safety of the public pursuant to RSA 597:2, III(a). The court reasoned that the "influx of fentanyl into New Hampshire poses a serious danger to the citizens and communities of this state," that the defendant traveled from Maine to New Hampshire to deliver the drugs, that the defendant's "role in the transaction was impersonal and businesslike," and that "this was not an isolated instance." The court denied the defendant's motion to reconsider, and this appeal followed.

On appeal, the defendant argues that the State failed to satisfy its burden pursuant to RSA 597:1-c. The State argues that we should review the trial court's decision under our unsustainable exercise of discretion standard. See State v. Spaulding, 172 N.H. 205, 207 (2019). We disagree. We recognize that we review a trial court's decision to order preventive detention pursuant to RSA 597:2, III(a) under an unsustainable exercise of discretion standard. See id. (stating that the court has "broad discretion to order a defendant to be held without bail"). However, RSA 597:1-c does not grant the trial court discretion but, rather, mandates that "[a]ny person arrested for an offense punishable by up to life in prison . . . shall not be allowed bail" if the "proof is evident or the presumption great." RSA 597:1-c (emphasis added); see also State v. Furgal, 161 N.H. 206, 209-10 (2010) ("RSA 597:1-c leaves the court with no discretion where the proof is evident or the presumption great. In such cases, a person 'shall not be allowed bail.'"). In other words, RSA 597:1-c precludes the exercise of discretion by requiring the court to deny bail if the State proves by clear and convincing evidence that the defendant committed the charged offense. See Furgal, 161 N.H. at 209-10, 216. Thus, unlike a bail decision pursuant to RSA 597:2, III(a), the trial court has not made a discretionary decision when it orders a defendant preventively detained under RSA 597:1-c. Accordingly, we will review the trial court's decision to detain the defendant pursuant to RSA 597:1-c under our sufficiency of the evidence standard.

To prevail upon this challenge, the defendant must demonstrate that no rational trier of fact, viewing all of the evidence and all reasonable inferences drawn therefrom in the light most favorable to the State, could have found the essential elements of the offense by clear and convincing evidence. See State v. Butler, 175 N.H. 444, 447 (2022); see also RSA 597:1-c; Furgal, 161 N.H. at 216 (holding that the State bears the burden of proof under RSA 597:1-c by clear and convincing evidence). In such a challenge, we objectively review the record to determine whether any rational trier of fact could have found the essential elements of the crime by clear and convincing evidence. See Butler, 175 N.H. at 447; Furgal, 161 N.H. at 216. Because a challenge to the

3

sufficiency of the evidence raises a claim of legal error, our standard of review is de novo.  Butler, 175 N.H. at 447.

RSA 597:1-c "is an exception to the general rule that all persons are eligible to be released pending trial."  Furgal, 161 N.H. at 209.  It provides that "[a]ny person arrested for an offense punishable by up to life in prison, where the proof is evident or the presumption great, shall not be allowed bail."  RSA 597:1-c.  The statute "requires the State to show first that the person is charged with an offense punishable by up to life in prison and then show that the proof is evident or the presumption great."  Furgal, 161 N.H. at 211.  The "presumption great" analysis requires that "'the circumstances are such that the inference of guilt naturally to be drawn from them is strong, clear, and convincing.'"  Id. at 217 (quoting 8 C.J.S. Bail § 28 (2005)).  The State must prove that the presumption is great by clear and convincing evidence.  Id. at 216.  Clear and convincing evidence is "[e]vidence indicating that the thing to be proved is highly probable or reasonably certain."  Black's Law Dictionary 698 (11th ed. 2019).

Here, the defendant is charged with violating RSA 318-B:26, IX, which states that:

> Any person who manufactures, sells, or dispenses methamphetamine, lysergic acid, diethylamide phencyclidine (PCP) or any other controlled drug classified in schedules I or II, or any controlled drug analog thereof, in violation of RSA 318-B:2, I or I-a, is strictly liable for a death which results from the injection, inhalation or ingestion of that substance, and may be sentenced to imprisonment for life or for such term as the court may order.

The trial court found that, pursuant to RSA 597:1-c, the State proved clearly and convincingly that "the presumption is great" that the drugs the defendant delivered to the decedent on July 29 were the same drugs that caused the decedent's death on July 31.  See RSA 597:1-c; RSA 318-B:26, IX.  Although we acknowledge that the trial court was presented with a close call, we disagree with its conclusion.  Based on the record before us, we conclude that no rational trier of fact could have found that the evidence clearly and convincingly demonstrated that the fentanyl delivered by the defendant on July 29 caused the decedent's death on July 31.  See Butler, 175 N.H. at 447.

We first note that approximately thirty-six hours elapsed from the time that the defendant delivered drugs to the decedent to the time of the discovery of the decedent's body.[1]  There is evidence that the decedent ingested some of the drugs he received on July 29, specifically a portion of the cocaine and fentanyl, soon after the delivery, and that he suffered a non-fatal overdose that

---

[1] The record does not include any evidence concerning the time of the decedent's death.

same evening.  Detective Gaudreau testified that the decedent's mother admitted to destroying drug paraphernalia and, most likely, the cocaine upon finding the decedent overdosing on the night of July 29.  The following day, on July 30, the decedent informed Peek-Antolin that he had "leaned on" what was delivered on July 29 and asked about purchasing more drugs, specifically cocaine.  That evening, the decedent met up with a few people after work, one of whom had a history of using and distributing drugs.

On July 31, the decedent died from fentanyl toxicity and his body was found with baggies of cocaine and fentanyl next to it.  The fact that the decedent sought to acquire more cocaine on July 30 from Peek-Antolin and that a baggie of cocaine was found next to his body the next morning credibly supports the supposition that the decedent may have acquired additional drugs after the defendant's delivery on July 29.  Although the record supports the inference that, at minimum, the decedent received more cocaine between July 30 and his death, the record provides no further information about what transpired and does not foreclose the possibility that the decedent acquired additional fentanyl.  Yet, Gaudreau testified at the bail hearing that no evidence connected the defendant to any drug deliveries to the decedent after July 29.

Moreover, the State presented no evidence as to the amount of fentanyl found at the scene.  The trial court attempted to elicit this information during the hearing when it asked the detective if he knew "the quantity of the dirty that was recovered in that bag."  The detective responded that it was "part of the toxicology or the lab result report," but that he did not "remember off the top of [his] head what the quantity was."  When the court asked the detective whether, given that he was at the scene of the decedent's death, he could "form a rough estimate of . . . the quantities of powder" based on his "training and experience," the detective responded that he could not tell the court "how much it was," but clarified that "[i]t wasn't like a massive amount or anything crazy."  Nor did the State present evidence as to whether two grams of fentanyl — the amount that the decedent appears to have received on July 29 — would have been sufficient to induce two overdoses or would have been enough to sustain a long-time opiate addict like the decedent for thirty-six hours.

The trial court also attempted to elicit this information by specifically asking Gaudreau, "do you know how many uses two dirty . . . do you have any way of knowing how many personal usages that would comprise?" to which the detective responded, "I do not know."  Therefore, given: (1) the extended period of time between the July 29 delivery and the decedent's death on July 31; (2) that within this timeframe the decedent used fentanyl at least twice; (3) the implication that another drug transaction occurred after July 29; and (4) the State's failure to present evidence regarding the amount of fentanyl found at the scene of the decedent's death or how long two grams of fentanyl would have sustained the decedent, we conclude that no rational trier of fact could have

5

found that the State met its burden of proving, by clear and convincing evidence, that the fentanyl the defendant delivered on July 29 was the cause of the decedent's death.

On this record, we conclude that it is not "highly probable or reasonably certain," Black's Law Dictionary, supra at 698, that the decedent died after using the same fentanyl that the defendant delivered on July 29. See RSA 597:1-c; RSA 318-B:26, IX. Because we cannot determine, on this record, whether the trial court's ruling of dangerousness pursuant to RSA 597:2, III(a) was influenced by its RSA 597:1-c ruling, we vacate and remand.

Reversed in part; vacated in part; remanded.

MACDONALD, C.J., and BASSETT and DONOVAN, JJ., concurred; HANTZ MARCONI, J., concurred in part and dissented in part.

**Timothy A. Gudas,
Clerk**

HANTZ MARCONI, J., concurring in part and dissenting in part. I agree with my colleagues that the standard of review under RSA 597:1-c is de novo when a defendant's appeal challenges the sufficiency of the evidence. I disagree that, on this evidence, the clear and convincing standard is not met. I would affirm the order of the trial court.

6